TAFT, Circuit Judge
(after stating the facts as above). Though other questions are raised by the assignment of errors, we shall discuss only the two which were presented and argued to the court.
It was first contended on behalf of the plaintiffs in error that the city could not claim damages for breach of the contract, by way of set-off, because its action in annulling the contract was a complete rescission of it, releasing each party from every obligation under it, as if there never had been a contract made. It is well settled that a technical rescission of the contract has the legal effect of entitling each of the parties to be restored to the condition in which he was before the contract was made, so far as that is possible, and that no rights accrue to either by force of the terms of the contract. But, besides technical rescission, there is a mode of abandoning a contract as a live and enforceable obligation, which still entitles the party declaring its abandonment to look to the contract to determine the compensation he may be entitled to under its terms for the breach which gave him the right of abandonment. In Mining Co. v. Humble, 153 U. S. 540, 551, 14 Sup. Ct. 876, 879, defendant excepted to the following instruction of the trial court:
“If tbe jury find from the evidence that the plaintiffs were in good faith endeavoring to carry out and perform said contract according to its terms, and the defendant wantonly or carelessly and negligently interfered with and hindered and prevented the plaintiffs in such performance, to such an extent as to render the performance of it difficult, and greatly decrease the profits *646 which the plaintiffs would otherwise have made, then and in such case such interference was unauthorized and illegal, and would have justified the plaintiffs in abandoning the contract, and would have entitled them to recover such damages as they actually suffered by being hindered and prevented from performing such contract.”
In sustaining the correctness of the charge thd supreme court, speaking by Mr-. Justice Brewer, said:
“It is insisted, and authorities are cited in support thereof, that a party cannot rescind a contract, and at the same time recover damages for his nonperformance. But no such proposition as that is contained in that instruction. It only lays down the rule—and it lays that down correctly—which obtains when there is a breach of a contract. Whenever one party thereto is guilty of such a breach as is here attributed to the defendant, the other party is at liberty to treat the contract as broken, and desist from any further effort on his part to perform; in other words, he may abandon it, and recover as damages the profits which he would have received through full performance. Such an abandonment is not technically a rescission of°the contract, but is merely an ■acceptance of the situation which the wrongdoing of the other party has brought about. Generally speaking, it is true that when a contract is not performed the party who is guilty of the first breach is the one upon whom rests all the liability for the nonperformance. A party who engages to do work has a right to proceed free from any let or hindrance of the other party; and if such other party interferes,—hinders and prevents the doing of the work.—to such an extent as to render its performance difficult and largely diminish the profits, the first may treat the contract as broken, and is not bound to proceed under the added burdens and increased expense. It may stop, and sue for the damages which it has sustained by reason of the nonperformance which the other has caused.”
It very frequently happens that laymen do not distinguish between these two ways of ending a contract, and, therefore, that words are used by a party which, literally and strictly construed, would effect a complete rescission and destruction of the contract, when the party’s real intention is only to declare his release from further obligation to comply with the terms of the contract by the default of the other party, and his intention to hold the other for damages. In such cases, courts consider, not only the language of the party, but all the circumstances, including the effect of a complete rescission upon the rights of the parties, and the probability or improbability that the complaining party intended such a result, in reaching a conclusion as to the proper construction of the language used. In this case the original contract provided for an “annulment” of the contract. If we can satisfy ourselves as to the meaning of the contract in this regard, it will throw a useful light on the meaning to be given to the subsequent action of the city authorities. The clause of the contract referred to is as follows:
“If the said W. J. Hayes & Sons fail to take and pay for any installments of bonds as above provided when delivered, then, at the option of the city of Nashville, this contract may be declared null and void in all provisions. As an evidence of good faith on the part of the said W. J. Hayes & Sons, and as a guaranty upon their part that they will faithfully carry out the provisions of this contract, they have delivered to the recorder of the said city of Nashville a draft for the sum of five thousand dollars, a receipt of which draft is hereby acknowledged by the said city of Nashville. A pro rata of said deposit, with 6 per cent, interest thereon, will be refunded to the said W. J. Hayes & Sons as each installment of bonds is taken up and paid for.”
We cannot suppose tbat the city, in making this contract, intended to reserve to itself only the right completely to destroy the contract, *647 and thus to obligate itself to give up to the defaulting party the indemnity it had been careful to secure against loss; and yet such must be the construction of the contract, if the annulment provided therein means a complete rescission. The obvious intent of the parties was that upon default the city might free itself from any obligation thereafter to deliver the subsequent installments of bonds to W. J. Hayes & Sons, and that the fund deposited should be an indemnity against any loss the city might suffer by reason of the default. And it was in accordance with such an intent that the city declared its annulment of the contract, for it appropriated to itself the $3,750 which still remained on deposit as indemnity for the performance of the contract. The declared intention of the city to retain its deposit can only be reconciled and made consistent with its declaration of annulment by construing the latter to be merely an abandonment of the contract, and not a complete rescission. This case presents many points in common with that of Cherry Valley Iron Works v. Florence Iron River Co., decided by this court, and reported in 22 U. S. App. 655, 12 C. C. A. 306, and 64 Fed. 569. That was a suit for damages for the breach of a contract to purchase 10,000 tons of ore. The contract provided for the payment of the price in installments according to periodical deliveries of the ore, and contained this stipulation:
“And, in case said party of the second part fails to make any or either of the above-named payments for the period of ten daj's after the same becomes due, said Florence Iron River Company shall have the right to cancel this contract for all ore not delivered at the time such' default is made.”
The purchaser had failed to make the payments according to the contract, and correspondence ensued, in which the seller threatened that, unless payment was made, the undelivered ore would be sold for account of plaintiff, and the difference between the selling price and the unpaid purchase price would be charged to the plaintiff. Finally the sellers notified the buyers, in a letter in which they quoted in full the clause permitting cancellation of the contract for all ore undelivered, that they canceled the contract in accordance with that clause. It was vigorously contended on behalf of the purchaser that the cancellation was necessarily a complete rescission, and that it released both parties from the obligation of the contract, and that no damages could be recovered for failure to receive and pay for the undelivered ore. This court did not yield to the contention, but held that, upon the exercise of the right of cancellation provided by the contract after a failure to make the agreed payment, the further performance of the contract was abandoned and the aggrieved party had the right to pursue its remedy for the damages sustained by it in consequence of the breach of the contract which was the cause of its abandonment The court, in reaching this conclusion, was fortified by the case of Lumber 'Co. v. Bates, 31 Mich. 158, 163, in which one party, by a declaration of rescission based on a default of the other party, was held not to intend a rescission in law, but a mere abandonment, because in the same letter was the declaration that the writer intended to look to the defaulting party for damages sustained by its failure to perform the contract. In the case of Railroad Co. *648 v. Howard, 13 How. 307, the contract between the railroad company and the building contractor contained the following clause:
“Provided, however, that in case the party of the second part shall at any time he of opinion that this contract is not duly complied with by the said party of the first part, or that it is not in due progress of execution, or that the said party of the first part is irregular or negligent, then and in such case he shall be authorized to declare this contract forfeited, and thereupon the same shall become null, and the party of the first part shall have no appeal from the opinion and decision aforesaid, and he hereby releases all right to except to or question the same, in any place, under any circumstances whatever: but the party of the first part shall still remain liable to the party of the second part for the damages occasioned by the said noncompliance, irregularity, or negligence.”
The railroad company availed itself of this provision, and notified the contractor, after he had done part of the work, that in its opinion the contract had not been duly complied with by him, and, therefore, that the contract be, "and the same is hereby, declared to be forfeited.” At the time of the forfeiture, money was due under the' contract to the contractor, and he brought suit for the same. It was contended on behalf of the company that by its action in accordance with the contract, annulling the same, all rights acquired under the contract had been destroyed. The court below had given the following instruction:
“But this annulling did not deprive him [1 e. the contractor] of any rights vested in him at that time, or make the covenant void ab initio, so as to deprive him of a remedy upon it for any money then due him for his work, or any damages he had then already sustained.”
Error was assigned to this charge on the ground stated above. In aflirming the correctness of the charge, Mr. Justice Curtis spoke as follows:
“The law leans strongly against forfeiture, and it is incumbent on the pa/rty who seeks to enforce one to show plainly his right to it. The language used in this contract is susceptible of two meanings: One is the literal meaning, for which the plaintiff in error contends,—that the declaration of the company annulled the contract, destroying all rights which had become vested under it, so that if there was one of the monthly payments in arrear and justly due from the company to the contractor, and as to which the company was in default, yet it could not be recovered, because every obligation arising out of the contract was at an end. Another interpretation 'is that the contract, so far as it remained executory on the part of the contractor, and all obligations of the company dependent on the future execution by him of any part of the contract, might be annulled. We cannot hesitate to fix on the latter as the true interpretation. In the first place, the intent to have the obligation of the contractor, to respond for damages, continue, is clear. In the next place, though the contractor expressly releases all right to except to the forfeiture, he does not release any right already vested under the contract, by reason of its part performance, and ‘expressio unius exelusio alteráis.’ And, finally, it is highly improbable that the parties could have intended to put it in the power of the company to exempt itself from paying money, honestly earned and justly due, by its own act declaring a forfeiture. The counsel for the plaintiff in error seemed to feel the pressure of this difficulty, and not to be willing to maintain that vested rights were absolutely destroyed by the act of the company; and he suggested that, though the covenant was destroyed, assumpsit might lie upon an implied promise. But if the intention of the parties was to put an end to all obligations on the part of the company arising from the covenant, there would remain nothing from which a promise could be implied; and, if this was not their intention, then we come back to the very interpretation *649 against which he contended, for, if the obligation arising from the covenant remains, the covenant is not destroyed. We hold the instruction of the court on this point to have been correct.”
In the case of Mayor, etc., of City of New York v. New York Refrigerating Construction Co., 146 N. Y. 210, 40 N. E. 771, the city made a contract with' a refrigerating company to introduce a refrigerating apparatus into one of the markets of the city. The contract provided that, in case of the default of the company after certain proceedings, the city comptroller might notify the company to discontinue its system. After the contract had been partially performed, the comptroller did notify the company that the contract was canceled and annulled. By reason of the prior occupancy of the market houses by the company under the terms of the contract, certain rent was due from the company to the city. The company claimed that the cancellation destroyed any cause of action arising under the contract and that the rent could not, therefqre, be recovered. It was held that the cancellation was not a rescission, in a strict, technical sense, which destroyed all right of action, but was simply a termination of the contract, leaving undetermined all existing liabilities. It was said that this result might be implied from all the surrounding circumstances, and grew out of the obvious meaning of the parties when the contract was executed, and that the position assumed by the appellants was “technical, forced, and unnatural.” The court said:
“We have been referred to numerous authorities laying down the general doctrine that, where a contract is rescinded while in the course of performance, no claim in respect of performance, or of what has been paid or received thereon, may thereafter be made. This general rule is subject, however, to the qualifications that any claim founded on the contract must be referred to the agreement of rescission, to ascertain Whether it has been expressly or impliedly reserved. See McCreery v. Day, 119 N. Y. 5, 23 N. E. 198. In the case cited, Judge Andrews says that the liability ‘depends on the intention to be deduced from the agreement of annulment, construed in the light of attending circumstances.’ ”
In Hinsdale v. White, 6 Hill, 507, a landlord terminated the tenancy of a tenant under a section of the statute which provided for the issuing of a warrant at the instance of a landlord by the magistrate for the removal of the tenant, with declaration that “the contract or agreement for the use of the premises, if any such exist, and the relation of landlord and tenant between the parties, shall be deemed to be canceled and annulled.” It was contended that the effect of this annulment and cancellation was a complete rescission of the contract of tenancy, and prevented the landlord from recovering any rent due him for occupancy by the tenant prior to the issuing •of the warrant. The court refused to give the statute and removal of the tenant such effect; holding that the annulment operated only from the time the warrant issued, leaving the contract in full effect previous to that time. The court said:
“Tbe words of tbe statute admit of either construction, inasmuch as they do not expressly fix the time; and, in determining which should prevail, it is our duty to regard consequences. To say that the contract shall be considered as void and inoperative from the beginning, would not only cut off the remedy afforded by its terms for rent which may have accrued at any time past, but *650 would even enable a tenant to recover back all he bad paid. A consequence so unjust we cannot allow without words expressly declaring it.”
This view was approved by the court of errors in McKeon v. Whitney, 3 Denio, 452, 453.
The foregoing cases seem to justify the interpretation we have nut upon the act of the city in declaring the contract of sale with the plaintiff at an end. The charge of the court below with reference to the action of the city of Nashville in annulling this contract was therefore correct.
The second and only remaining question for our consideration is the question of damages. In the case of Cherry Valley Iron Works v. Florence Iron River Co., 22 U. S. App. 655, 12 C. C. A. 306, and 64 Fed. 569, the question was of the proper measure of damages for the breach of the contract to take iron ore. The ore contracted to be sold in that case had not yet been taken from the mass. The subject of the bargain was not identified at the time when it was made, nor had it afterwards been identified before the breach. In considering the rule of damages, Judge Severens, in delivering the opinion of this court, said:
“If the subject-matter is identified when the contract is made, the title passes to the vendee, in the absence of controlling stipulations. When the subject-matter is subsequently identified by its appropriation to the contract, the title passes at the time of such' appropriation; but, when there has at no time been any identification of the subject, the title remains in the vendor. In those cases where the title has passed before the contract is broken, and the rights of the parties have been converted into claims for damages arising from the breach, the nature and kind of remedies to which the vendor may resort are the subject of much controversjr in the opinions of the courts. There is high authority for the proposition that the vendor in such a ease may, among other remedies, by virtue of a species of lien for the purchase price, sell the goods as those of the vendee, and hold the latter for the difference between the price obtained and the contract price. This was the remedy resorted to here. It is not necessary for us to decide whether the vendor has this remedy in the class of eases just mentioned.”
Tbe learned judge tben proceeded to show that the case he was dealing with did not belong to that class, that the title never passed, and that the goods to be sold at all times remained the property of the vendor, and, therefore, that the measure of damages was not to be reached by the remedy resorted to, of a resale, but that the vendor must recover the difference between the contract price and the market price at the time fixed for the delivery. In the case at bar, the subject-matter of the contract was bonds which were issued and .appropriated to the contract within a very short time after it was made. The language of the contract is that of present sale. The title, therefore, did pass; and we have presented to us the question stated by Judge Severens in the passage just referred to, but which the court in that case did not find it necessary to decide, to wit, whether, when the title passes to something which is sold, one of the remedies of the vendor for a failure by the vendee to make payments in accordance with the contract at the times fixed for the deliveries and payments is, after notice, to resell the subject-matter of the sale, and to hold the defaulting vendee for the difference between the proceeds of the resale and the contract price. We think that the *651 vendor has such a remedy. The leading American authority is Sands v. Taylor, 5 Johns. 395. In that case the suit was for failure to receive part of a cargo of grain by a contracting purchaser. Chief Justice Kent stated the rule as follows:
“Nor was the subsequent act of the plaintiffs, in selling the wheat not delivered, a waiver of their claim for damages for nonperformance of the contract. The usage in such cases is to sell the article, after due notice to the other party to take it, and that in default of doing it the article will be sold. The usage is convenient and reasonable, and for the best interest of both parties.”
In McClure v. Williams, 5 Sneed, 718, Judge McKinney, speaking for the supreme court of Tennessee, said:
“If goods have been bargained and sold by a valid contract, so that the right of property has thereby passed to the purchaser, the failure of the latter to receive and pay for the goods at the time and in the manner agreed upon will not have the effect of rescinding the contract, and revesting the right of property in the vendor, so as to entitle him to resell the goods, without something more on his part. In such case the seller has an election to proceed either, in an action for goods bargained and sold, to recover the price Stipulated to be paid, or he may give the purchaser notice of his intention to resell the goods within a reasonable time from the service of such notice; and if, after notice, the purchaser will not take the goods or pay the price, the seller is not bound to keep them, to his own injury, but may resell them, and the purchaser will be held to have assented, and to have given the seller an implied authority to resell, and he will be responsible for the reasonable loss, if any, as also for the expenses of the resale,—that is, the difference between the price obtained on such resale and that originally agreed to be paid by the purchaser.”
See, also, Hughes’ Case, 4 Ct. Cl. 64.
Mr. Benjamin, in his work on Sales (section 788), after having stated the English law, says that:
“In the United States the law is somewhat different; and in Dustan v. McAndrew, 44 N. Y. 72, it was stated as follows: ‘The vendor of personal property, in a suit against the vendee for not taking and paying for the property, has the choice, ordinarily, for one of three remedies: First, he may store or retain the property for the vendee, and sue him for the entire price; second, he may sell the property, acting as the agent for this purpose of the vendee, and recover the difference between the contract price and the price of resale; or, third, he may keep the property as his own, and recover the difference between the market price at the time and place of delivery and the contract price.’ ”
See, also, the American cases cited by the American editors on page 775 of Bennett’s Edition of Benjamin on Sales (1892).
In Sedg. Meas. Dam. § 750, the learned author says, referring to cases where the title to the subject-matter of the sale has passed:
“It seems to be well settled in such cases that the vendor can resell them, if he see fit, and charge the vendee with the difference between the contract price and that realized at the sale. Though perhaps more prudent, it is not necessary that the sale should be at auction. It is only requisite to show that the property was sold for a fair price.”
See, also, Suth. Dam. § 647, and cases cited.
In the case at bar the correspondence between the parties, and the action of the city council, communicated to Hayes & Sons, leave no doubt that due notice of the intention of council to resell the bonds was conveyed to Hayes & Sons, though this was not expressly stated in the contract of annulment. The situation of the city was *652 .such, as explained in previous letters by its recorder to Hayes & Sons, that Hayes & Sons could have been left in no doubt as to the intention of the city to resell. Indeed, the letters of Hayes & Sons .show that they supposed that the city was looking for a purchaser even before the formal action was taken by the city council, and .approved its action in so doing. It was proved in the case that the .city took the usual mode of disposing of such bonds, in its resale of them to Quintar d; and the court left it to the jury to say whether the city had used due diligence, and had pursued the usual methods in disposing of such property, charging them that, if it had done :SO, then the difference between the price at which the bonds sold and the contract price was the proper measure of damages, and that it might be set off against plaintiffs’ claim to recover the indemnity deposit from the city. This was correct. On the whole case, we find no error in the charge of the court below, and the judgment is .affirmed.